**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**JAMES J. PHELPS**                                                                                   **PLAINTIFF**

**V.**                       **CASE NO. 3:15-CV-00348 JTK**

**CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION**                                             **DEFENDANT**

**ORDER**

**I. Introduction:**

Plaintiff, James J. Phelps, applied for disability benefits on November 6, 2012, alleging a disability onset date of August 15, 2012. (Tr. at 10). After conducting a hearing, the Administrative Law Judge ("ALJ") denied his application. (Tr. at 19). The Appeals Council denied his request for review. (Tr. at 1). The ALJ's decision now stands as the final decision of the Commissioner, and Phelps has requested judicial review.

For the reasons stated below, the Court[1] affirms the decision of the Commissioner.

**II. The Commissioner's Decision:**

The ALJ found that Phelps had not engaged in substantial gainful activity since the onset date of August 15, 2012. (Tr. at 12). The ALJ found at Step Two that Phelps had the following severe impairments: osteoarthristis, degenerative disc disease, asthma, headaches, and obesity. *Id*. At Step Three, the ALJ determined that Phelps's impairments did not meet or equal a listed impairment. (Tr. at 14). Before proceeding to Step Four, the ALJ determined that Phelps had the residual functional capacity ("RFC") to perform the sedentary work with the following restrictions:

---

[1] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge.

1) only occasional climbing of stairs, balancing, stooping, kneeling, crouching, and crawling; 2) no climbing of ladders; 3) occasional overhead reaching; 4) must avoid concentrated exposure to dust, fumes, gases, odors, smoke, and poor ventilation; and 5) cannot work without the use of a cane. *Id.* Next, the ALJ found that Phelps is not capable of performing past relevant work. (Tr. at 17). At Step Five, the ALJ relied on the testimony of a Vocational Expert ("VE") to find that, based on Phelps's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that he could perform at the sedentary level, specifically, dispatcher and cashier I. (Tr. at 19). Based on that Step Five determination, the ALJ held that Phelps was not disabled. *Id.*

### III. Discussion:

    A. Standard of Review

The Court's role is to determine whether the Commissioner's findings are supported by substantial evidence. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). "Substantial evidence" in this context means less than a preponderance but more than a scintilla. *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009). In other words, it is "enough that a reasonable mind would find it adequate to support the ALJ's decision." *Id.* (citation omitted). The Court must consider not only evidence that supports the Commissioner's decision, but also evidence that supports a contrary outcome. The Court cannot reverse the decision, however, "merely because substantial evidence exists for the opposite decision." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).

    B. Phelps's Arguments on Appeal

Phelps argues that substantial evidence does not support the ALJ's decision to deny benefits.

2

He contends that: 1) Phelps met listings 1.02 and 1.04; 2) the ALJ erred in assigning Phelps's RFC; and 3) the ALJ did not pose a proper hypothetical to the VE. For the following reasons, the Court finds that substantial evidence supports the ALJ's decision.

Phelps had two surgeries in 2010 to repair his left knee, including a total left knee replacement on September 15, 2010. (Tr. at 321-322, 324). At a September 28, 2010 follow-up appointment with Dr. Ron Schechter, M.D., an orthopedist at Paragould Orthopaedics, Dr. Schechter reported that Phelps was "doing fine" post-surgery and that he was making adequate progress with physical therapy on the knee. (Tr. at 307). On October 26, 2010, Phelps reported to Dr. Schechter that he was "doing better" with little to no pain, and that he was "very pleased with [the] results of surgery." (Tr. at 305). He was walking well, with no limp. *Id.* Dr. Schechter noted that Phelps could return to full duty work when he was ready. *Id.* Phelps returned to work as a welder until August 2012 (Tr. at 210-211).

Phelps testified that he has had multiple steroid injections in both knees, with little efficacy. (Tr. at 43). He added that he walks with a cane. *Id.* Phelps stated that Dr. Stacy Noel, M.D., his PCP, told him to keep his legs elevated to minimize swelling. *Id.* In April 2013, x-rays of Phelps's right knee and left hip were unremarkable. (Tr. at 535-537).

On May 24, 2011, Phelps saw Dr. Tory Stallcup, M.D., at Family Practice Clinic of Paragould. (Tr. at 448). He reported that his depression was better, but that he had some "minor" issues, including anxiety and panic attacks that were increasing. *Id.* Dr. Stallcup prescribed buspirone for anxiety and clonazepam for sleep. *Id.* He recommended that Phelps seek counseling. *Id.* Phelps did not seek counseling.

On July 13, 2012, Phelps saw Dr. Noel for anxiety, after he had apparently stopped taking

his clonazepam. (Tr. at 427). Dr. Noel started him back on Lexapro and clonazepam, and he continued taking buspirone. *Id.* Phelps denied suicidal or homicidal thoughts, and said he was "resting well." (Tr. at 428). On July 10, 2013, Dr. Noel noted a positive response to anxiety medications. (Tr. at 553).

There is no record of Phelps seeking mental health treatment at any time, in spite of his doctors' recommendation. He indicated he worked after the recommendation for mental health treatment. (Tr. at 37). Phelps also testified that he had not pursued psychiatric treatment for anxiety, his alleged disabling impairment. *Id.*

In September 2012, an MRI of Phelps's cervical spine revealed disc herniations at C3-C4 and C6-C7 with acquired spinal stenosis. (Tr. at 330-331). The MRI also showed straightening of the normal lordatic curvature of the cervical spine. *Id.* On October 15, 2012, Phelps saw a neurologist, Dr. Rebecca Barrett-Tuck, at the NEA Baptist Neurosurgery Clinic. She noted normal gait and station, normal muscle strength, and normal muscle tone, with no atrophy or plasticity. (Tr. at 381). Dr. Barrett-Tuck found disc abnormalities at C3-C4 and C6-C7. She recommended surgery but she advised that surgery up the entire neck to fix C3 through C7 was inadvisable. *Id.*

On October 25, 2012, Dr. Barrett-Tuck performed a diskectomy and fusion surgery on C6-C7. (Tr. at 359). The day after surgery, Phelps was able to ambulate, chew, and swallow without difficulty. (Tr. at 371). He had improved significantly. *Id.* Phelps was discharged home on October 26, 2012 in "good condition." *Id.* Dr. Barrett-Tuck recommended he return for a second cervical surgery if needed. (Tr. at 382). He did not pursue a second surgery. (Tr. at 40).

On December 18, 2012, Phelps returned to the Baptist Neurosurgery Clinic for a post-operative appointment. (Tr. at 401). X-rays showed good alignment and appropriate placement of

hardware, with no acute spine bony abnormality. *Id.*, (Tr. at 403). He denied pain, numbness, or tingling, but he reported headaches and bilateral shoulder pain. *Id.* APN Starla Emery found good strength in his bilateral upper arms and normal reflexes in the upper extremities. *Id.* Phelps said he was taking Hydrocodone for pain. *Id.* Phelps told Ms. Emery that he had resumed his normal activities without any difficulty. *Id.*

Indeed, in Phelps's March 2013 Function Report, he stated he prepared meals, fed his dog, had no problems with personal care, did some cleaning, laundry, and dishes, drove, and shopped. (Tr. at 256-258). The ability to perform such daily activities, especially after a total knee replacement and a major neck surgery, undermine Phelps's claims of disability. *See Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995); *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003).

An MRI of Phelps's lumbar spine on February 5, 2014 revealed degenerative changes with some disc herniation but no spinal stenosis. (Tr. at 584). Phelps did not seek physical therapy, a pain management specialist, or surgery for his lumbar spine. Overall, his treatment was conservative.

Phelps claims that osteoarthritis and pain in his shoulders are disabling and would prevent any overhead reaching in a work setting. Phelps's attorney's attempt to summarize the records pertinent to his shoulders could be construed as misleading, as he attributes the opinions of Dr. Stacy Noel, Phelps's PCP, to that of Dr. Ron Schechter, the orthopedist at Paragould Orthopaedics. (Docket No. 10 at 8). The opinions of a specialist would carry more weight than that of a PCP, so the distinction is important. The Court assumes Phelps's attorney's mischaracterization of medical records is unintentional, but it requires untangling to evaluate the extent of the shoulder impairment.

Dr. Schechter saw Phelps on February 18, 2010 (Phelps's attorney incorrectly dated the visit

April 18, 2010; No. 10 at 8).  (Tr. at 315).  Phelps reported his knee was doing well after the first surgery, but complained of waxing and waning shoulder pain over the last decade, which was not severe enough to seek medical attention.  *Id.*  He told Dr. Schechter that in the last 2-3 years, as the shoulder pain increased, he began receiving steroidal injections from Dr. Noel.  *Id.*  He initially experienced relief but the injections stopped helping.  *Id.*  Pain medications did not give relief, and the pain radiated down the arms and caused occasional numbness and tingling.  *Id.*  Overhead reaching made the pain worse.  *Id.*  Dr. Schechter read x-rays that showed moderate degenerative changes but otherwise normal findings.  (Tr. at 316).

Dr. Schechter diagnosed subacromial impingement in both shoulders and symptoms suggestive of right bicep tendinitis.  *Id.*  With radiating shoulder pain, Dr. Schechter did not rule out a rotator cuff tear or neuropathy/radiculopathy.  *Id.*  He recommended an MRI and physical therapy for the shoulders but Phelps did not pursue those courses.  *Id.*, (Tr. at 37).

Phelps's attorney attributed August 28, 2012 and November 14, 2012 appointments with Dr. Noel to "Plaintiff's orthopedic" (No. 10 at 8).  On August 28, 2012, Phelps complained to Dr. Noel of shoulder pain shooting down both shoulder blades, in spite of steroid injections the week before (Tr. at 420, 423).  Phelps requested to be off work.  (Tr. at 420).  Dr. Noel excused Phelps from work for a week.  *Id.*  He continued taking Tramadol and Lortab for pain.  *Id.*

On November 14, 2012, Dr. Noel noted pain and arthritis in both shoulders.  (Tr. at 414).  Dr. Noel (not Dr. Schechter, as Phelps's attorney indicated) diagnosed polyarthropy and said Phelps was not able to work.  (Doc. No. 10 at 8, Tr. at 414).  She noted he had an interview for disability benefits the next day.  (Tr. at 415).

At his October 15, 2012 visit to Dr. Barrett-Tuck, Phelps complained of shoulder pain that

increased with activity, and stated that he had associated migraine headaches. (Tr. at 355). Dr. Barrett-Tuck did not conduct any objective medical imaging on his shoulders to confirm Phelps's subjective complaints of pain. Additionally, he said his migraines were improving as of the hearing date. (Tr. at 16). Moreover, upon examination, Dr. Barrett-Tuck found intact arm strength, good posture, and normal gait. (Tr. at 357).

Phelps's complaints of serious shoulder pain are undermined by the normal musculoskeletal and upper extremity exam conducted by APN Starla Emery on December 18, 2012. (Tr. at 401; *supra* at 4). At that time, he stated he was doing well and had resumed normal activities. *Id.*

Dr. Noel completed a check-box Medical Source statement on February 28, 2014. (Tr. at 586). She indicated debilitating arthritis in Phelps's shoulders and knees. She stated he could lift less than 10 pounds occasionally and could sit, stand, and walk for a maximum of two hours each in an 8 hour workday. *Id*. Dr. Noel indicated that he would need all possible postural accommodations at work, including ability to change positions, elevate his feet, and take longer than normal breaks. *Id.* She said he could never reach (including overhead), finger, or handle, and that he had to walk with a cane*. Id.* Dr. Noel did not refer to any objective testing in her opinion. *Id*.

The ALJ correctly discounted Dr. Noel's check-box opinion that Phelps would be unable to perform even sedentary work. A conclusory check-box form has little evidentiary value when it cites to no medical evidence and provides little or no elaboration. *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012); *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)(finding that the ALJ properly rejected a physician's assessment where it was inconsistent with the objective medical evidence and other evidence in the record).

Objective testing by Phelps's doctors after both knee and neck surgeries revealed the

surgeries were successful and he could resume his daily activities and return to work. His daily activities of preparing meals, doing chores, driving, shopping, attending to personal care, and feeding his dog indicate that his conditions are not as disabling as alleged. (Tr. at 256-258). While Phelps did take narcotics and he received steroid injections, he did not seek a pain management specialist, or pursue the recommended physical therapy for his conditions (other than for his knee, which improved after the surgery). And Phelps admitted that he had not followed up with Dr. Barrett-Tuck about further cervical surgery. (Tr. at 40). *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (failure to seek regular and available medical treatment undermines claim of disabling pain).

As for Phelps's listing argument, the ALJ did not err in finding he did not meet listing 1.02 (dysfunction of a joint) or 1.04 (disorders of the spine). 20 C.F.R. Pt. 404, Subpt. P, App 1 § 1.02, 1.04. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." . . That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (internal citations omitted). To meet a listing, an impairment must meet all of the listing's specified criteria. *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010). The claimant has the burden of showing he met a listing. *See King v. Astrue*, 564 F.3d 978, 979 (8th Cir. 2009(burden of proving disability rests with claimant through Step Four of the sequential evaluation process).

Listing 1.02 requires at a minimum gross anatomical deformity of a joint and joint pain with stiffness, as well as objective evidence of joint space narrowing, bony destruction, or ankylosis of

affected joints.  20 C.F.R. Pt. 404, Subpt. P, App 1, § 1.02.  Additionally, paragraphs A or B must be met.  Paragraph A requires the inability to ambulate effectively due to involvement of the hip, knee, or ankle.  Paragraph B requires inability to perform fine and gross movements effectively due to the involvement of one major joint in each upper extremity.  *Id.*

Phelps cites Dr. Noel's Medical Source Statement to argue he met these requirements with respect to his shoulders and knees. (No. 10 at 12).  This argument fails.  First, his knee surgery was a success and he could perform daily activities requiring ambulation with the help of a cane.  Second, the conclusions reached by Dr. Noel with respect to his shoulders were not supported by evidence from specialists, and she did not reference any of her own objective testing.  The only diagnosis of shoulder impingement was from Dr. Schechter in 2010, and thereafter the record only reflects subjective complaints of shoulder pain from Phelps, not clinical testing.  Again, in light of only conservative treatment and reports of normal musculoskeletal exams, Dr. Noel's conclusory opinions do not merit great weight.  The statements of a treating physician may be discounted if they are inconsistent with the overall assessment of the physician or the opinions of other physicians, especially where those opinions are supported by more or better medical evidence.  *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir. 2000);  *see House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007)(an ALJ is not required to give controlling weight to the opinion of a treating physician if the opinion is inconsistent with other substantial evidence in the record).

For the same reasons, there is support for the ALJ's decision that Phelps did not meet listing 1.04 (disorders of the spine).  That listing requires a spinal disorder, along with nerve root compression, sensory loss, and straight-leg raise; or spinal arachnoiditis requiring the need for changing positions every two hours; or lumbar spinal stenosis resulting in pseudoclaudication,

chronic radicular pain, and the inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App 1 § 1.04. Phelps did not have sensory loss, straight-leg raise, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. Doctors noted marked improvement and range of motion in Phelps's cervical spine after his surgery, and urged him to resume normal activities, which he did. Moreover, Dr. Noel did not mention Phelps's spine in her Medical Source Statement, so even his PCP found no apparent limitation with respect to his back. (Tr. 586). The medical evidence supports the ALJ's listings determination.

Phelps's argument that substantial evidence does not support the ALJ's RFC determination fails for the same reasons his listings argument fails. A claimant's RFC represents the most he can do despite the combined effects of all of his limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's [RFC], the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of [his] impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996); *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010). The ALJ must consider all of the evidence in the record when determining an RFC, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004).

Upon weighing the objective medical evidence, and granting little weight to Dr. Noel's opinions for valid reasons, the ALJ assigned an RFC with several physical limitations reflective of Phelps's impairments. The RFC in this case included the restriction to sedentary work as well as postural limitations; it also allowed for the use of a cane on the job. (Tr. at 14). An ALJ's restriction to sedentary work is itself a significant limitation. *Ellis v. Barnhart*, 392 F.3d 988, 994

(8th Cir. 2005). Considering the evidence as a whole, including medical records, physicians' observations, and Phelps's subjective statements about his capabilities, the ALJ properly evaluated Phelps's physical impairments in assigning the RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

As for Phelps's anxiety, the evidence in the record does not show that the ALJ should have added mental restrictions to the RFC. In a July 2013 record, Dr. Noel noted that from a psychological standpoint, Phelps was doing well. (Tr. at 553). Phelps testified that his medications helped slow down his panic attacks. (Tr. at 45-46). An impairment that can be controlled by treatment or medication is not considered disabling. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002). Phelps did not seek any mental health treatment and only his PCP prescribed his psychiatric medications. Moreover, Phelps's neurologist, Dr. Barrett-Tuck, found in October 2012 that Phelps had normal memory, normal thought process, and normal attention span. (Tr. at 357). The ALJ properly considered Phelps's lack of treatment by any mental health professional in finding that anxiety had no more than a minimal effect on his ability to perform basic work activities. (Tr. at 13); *see Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

Finally, Phelps argues that the hypothetical the ALJ proposed to the VE was incomplete because it did not include limitations based on: 1) anxiety; 2) the need to elevate his legs throughout the day; and 3) shoulder pain. This argument dovetails with the RFC argument, and likewise fails.

For the reasons stated above, the ALJ did not need to include mental limitations, based on anxiety, in the hypothetical. Next, Phelps does not point to any objective medical evidence that would require him to elevate his legs throughout the day (Dr. Noel suggested that in her overly restrictive Medical Source Statement, which was properly discounted). *Haggard v. Apfel*, 175 F.3d

11

591, 595 (8th Cir. 1999)(an ALJ need not include additional complaints in the hypothetical not supported by substantial evidence).  And third, the postural limitations the ALJ included in the hypothetical adequately reflected the impact of shoulder pain on Phelps's ability to use his arms for overhead reaching.  Dr. Barrett-Tuck found good strength in his bilateral upper arms, and Phelps's activities suggest he is able to do some overhead reaching. (Tr. at 401).  A hypothetical is sufficient if it sets forth limitations supported by substantial evidence in the record and accepted as true by the ALJ.  *See Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001).

## IV.  Conclusion:

There is substantial evidence to support the Commissioner's decision to deny benefits.  The ALJ properly assessed Phelps's conditions based on the evidence in the record as a whole; he made a proper determination on the listings and the RFC, and the hypothetical posed to the VE was reflective of Phelps's actual limitations.  The finding that Phelps was not disabled within the meaning of the Social Security Act, therefore, must be, and hereby is affirmed.  The case is dismissed, with prejudice.

IT IS SO ORDERED this 22nd day of December, 2016.

_____
UNITED STATES MAGISTRATE JUDGE